IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Stuart Brooks,                          :
                    Petitioner         :
                                       :
       v.                              :  No. 936 C.D. 2023
                                       :
Trustees of the University of          :
Pennsylvania (Workers'                 :
Compensation Appeal Board),            :
                    Respondent         :  Submitted:  September 9, 2024

BEFORE:    HONORABLE ELLEN CEISLER, Judge
           HONORABLE LORI A. DUMAS, Judge
           HONORABLE MARY HANNAH LEAVITT, Senior Judge

OPINION
BY JUDGE CEISLER                              FILED:  October 21, 2024

Stuart Brooks (Claimant) petitions this Court for review of the July 28, 2023 Order of the Workers' Compensation Appeal Board (Board) affirming a decision by a workers' compensation judge (WCJ), which granted a petition by the Trustees of the University of Pennsylvania (Employer) to modify Claimant's workers' compensation benefits (Modification Petition). Claimant alleges that Employer's medical expert failed to comply with Section 306(b)(2) of the Workers' Compensation Act (Act),[1] and argues that the Modification Petition was thereby improperly granted. Upon review, we affirm.

## I. Background

Claimant was working for Employer as a nurse when, on December 7, 2018, he was injured while assisting a patient. Certified Record (C.R.), Item No. 29,

---

[1] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. § 512(2). In relevant part, Section 306(b)(2) provides that an insurer or employer's vocational expert "shall comply with the Code of Professional Ethics for Rehabilitation Counselors pertaining to the conduct of expert witnesses." *Id.*

Notice of Compensation Payable (NCP). Employer listed the injury in its NCP as a strain or tear of the shoulder muscles and immediately began issuing wage loss benefits. *Id.* On December 8, 2020, Employer submitted its Modification Petition, in which it alleged that Claimant was "capable of working" and that "jobs within [his] physical capabilities have been identified and provided to Claimant" through a labor market survey.[2] In support of the Modification Petition, Employer submitted deposition testimony of Dr. Andrew Sattel, an orthopedic surgeon who conducted an independent medical examination (IME) of Claimant; by Mr. Jeff Sund, the vocational expert who authored the labor market survey; and by Claimant himself. Claimant also offered live testimony before the WCJ at a February 23, 2022 hearing.

## A. Claimant's First Testimony

At his June 9, 2021 deposition, Claimant stated that he had been working for Employer as a nurse in the neurosurgical wing of the Hospital of the University of Pennsylvania (HUP) for eight and one-half years at the time of his injury. C.R., Item No. 20, Brooks Dep. at 8. His primary duties included assessing the physical condition of patients, monitoring their care, and administering medication. *Id.* at 8-9. As a neurosurgical wing nurse, Claimant was expected to be able to recognize complex neurological disorders that are often undiagnosed. *Id.* at 9.

Claimant recalled that, on December 7, 2018, he was helping a patient return from the bathroom and back into bed when the patient suddenly began to fall away from Claimant's grasp. *Id.* at 7. To keep the patient from falling to the floor, Claimant reached out with his right arm and immediately felt "a sharp burning pain

---

[2] Pursuant to Section 306(b)(2) of the Act, an employer may request a modification of benefits based upon earning power. 77 P.S. § 512(2). *South Hills Health Sys. v. Workers' Comp. Appeal Bd. (Kiefer)*, 806 A.2d 962, 966 (Pa. Cmwlth. 2002). To establish earning power, an employer may (1) offer to a claimant a specific job that is available; or (2) establish earning power through expert opinion evidence of a labor market survey. *Id.*

in [his] right shoulder area." *Id.* Claimant immediately left work and, at the time of the deposition, had not returned as a nurse. *Id.* at 9-10. For a 10-week period in 2019 and for an additional 4-week period in early 2020, Claimant performed light-duty work for Employer, but was not offered a permanent position within his work restrictions.[3] *Id.* at 10-11.

After leaving work, Claimant received treatment for his injury from two specialists in occupational medicine at Good Shepherd Physical Therapy, Drs. Savul and Sennett, and from an orthopedist, Dr. Austin. *Id.* at 11. Claimant recalled that Drs. Savul and Sennett discharged Claimant from their care in March 2019, and Dr. Austin did the same the following August. *Id.* at 12. Following a functional capacity evaluation (FCE) performed on June 27, 2019, Dr. Sennett released Claimant to work with restrictions to accommodate his injury.[4] *Id.* at 13-14. As a result of the FCE, Claimant participated in a vocational interview with Mr. Sund. *Id.* at 15. Claimant recalled that Mr. Sund followed up days later with a report listing several available jobs that were near Claimant's residence and within his work restrictions. *Id.* However, Claimant did not apply for any of those positions. *Id.* at 16.

Asked to describe his daily activities, Claimant explained that he spends most of his time caring for his infant daughter at home. *Id.* at 24-25. Claimant also helps to clean and maintain the house that he and his wife share, despite persistent pain in his right shoulder that makes activities such as sweeping and vacuuming difficult.

---

[3] Claimant's employment was ultimately terminated by Employer via a February 25, 2020 letter. *See* C.R., Item No. 31.

[4] Pursuant to Section 306(b)(3) of the Act, Employer sent Claimant a Notice of Ability to Return to Work on August 8, 2019, citing the results of the FCE. *See* C.R., Item No. 14. A second Notice of Ability to Return to Work was sent on February 27, 2020, notifying Claimant that Dr. Sennett had released him to work with limitations on duties involving lifting or pushing. *See* C.R., Item No. 26.

*Id*. at 26-27. However, Claimant has not scheduled any appointments with medical providers to address the shoulder pain. *Id.* Claimant also testified to spending some of his day looking for available work, but acknowledged that he had not filled out any applications since his job with Employer ended. *Id.* at 25.

## B. Sattel Testimony

At a November 9, 2021 deposition, Dr. Andrew Sattel recalled that he performed an IME of Claimant on August 11, 2021. C.R., Item No. 22, Sattel Dep. at 13. Before the examination, Dr. Sattel reviewed Claimant's medical records with him, including those from Good Shepherd Physical Therapy, the FCE by Dr. Sennett, and a December 12, 2018 magnetic resonance image (MRI) of Claimant's right shoulder. *Id.* at 15-16. Claimant also provided Dr. Sattel with a detailed account of his December 7, 2018 work injury. *Id*. at 15.

During the examination, Dr. Sattel observed that Claimant experienced discomfort with full overhead reach of his right arm. *Id.* at 20. Dr. Sattel also noted that Claimant's external shoulder rotation (i.e., the ability to rotate the upper arm away from the torso) was equal on both sides, but that internal rotation was less on the right than on the left. *Id.* at 18-19. Because of the lingering symptoms of discomfort and diminished mobility, Dr. Sattel opined that Claimant should avoid "patient lifts and transfers." *Id.* at 26. With those restrictions, however, Dr. Sattel concluded that Claimant was "capable of working at many activities as a registered nurse, sedentary to light." *Id.* Dr. Sattel opined that, since Claimant has ruled out surgical treatment, he is "at maximum medical improvement, best suited for light[-]duty status." *Id.* Additionally, Dr. Sattel agreed that all of the work positions

identified by Mr. Sund and provided to Claimant (summarized below) were within the work restrictions prescribed by Dr. Sattel.[5] *Id.* at 29.

## C. Sund Testimony

At a July 16, 2021 deposition, Mr. Sund testified that he has been employed by Allegiant Managed Care as a vocational and medical case manager since 2012. C.R., Item No. 23, Sund Dep. at 7-8. Mr. Sund stated that he has worked in vocational rehabilitation, consulting, and case management since 1990. *Id.* at 26. After he was assigned Claimant's case, Mr. Sund drafted a financial disclosure letter, which explained that Claimant was not Mr. Sund's client, and that the purpose of the services provided by vocational case managers such as Mr. Sund is to determine an earning capacity that may be used in litigation. *Id.* at 40-41. On March 10, 2020, Mr. Sund received confirmation that the financial disclosure letter was printed and mailed to Claimant. *Id.* at 39.

Mr. Sund recalled that he conducted a vocational interview of Claimant on April 7, 2020. *Id.* at 41. The two discussed Claimant's work and educational history, the work injury sustained by Claimant, and the medical treatment that Claimant had since received. *Id.* at 47-48. Claimant acknowledged that he no longer saw any physician because of the work injury, nor has he sought any further treatment since July, 2019. *Id.* at 46-47. As part of the interview process, Mr. Sund conducted a transferable skills analysis, which revealed that Claimant has a "higher-than-average skill level" as a registered nurse, as well as "customer and personal service skills." *Id.* at 49. Mr. Sund was also provided with copies of the July 11, 2019 letter by Dr. Sennett releasing Claimant back to light-duty work, the results of the June 27, 2019

---

[5] Following the IME performed by Dr. Sattel, Employer sent Claimant a third Notice of Ability to Return to Work on September 15, 2021, citing the doctor's findings. *See* C.R., Item No. 28.

FCE, and the first two Notices of Ability to Return to Work. *Id.* at 42-43. Employer also confirmed to Mr. Sund via e-mail that it had no permanent positions available for Claimant. *Id.* at 43. On April 9, 2020, Mr. Sund summarized the information he had thus far gathered in an Initial Vocational Evaluation Report (Initial Report). *Id.* at 104; *see also id.*, Vocational Packet, Section E. The Initial Report also contained an explanation that Mr. Sund met the minimum qualifications to conduct a vocational interview.[6] *Id.* at 31.

---

[6] The Initial Report contains a citation of 34 Pa. Code § 123.202(a)(2)-(4), which provides that individuals are qualified to conduct Earning Power Assessment interviews if they possess **one** of the following:

> (2) Certification by a Nationally recognized professional organization specified in paragraph (1)(i) [providing for qualification through certification by professional organizations combined with one year or more of relevant work experience] under the direct supervision of an individual possessing the criteria in paragraph (1).
>
> (3) Possession of a Bachelor's degree or a valid license issued by the Department of State's Bureau of Professional and Occupational Affairs, as long as the individual is under the direct supervision of an individual possessing the criteria in paragraph (1).
>
> (4) At least 5 years [of] experience primarily in the workers' compensation field prior to August 23, 1996, as a vocational evaluator, with experience in analyzing labor market information and conditions, [and] industrial and occupational trends, with primary duties providing actual vocational rehabilitation services, which include, but are not limited to, the following:
>
> > (i) Job seeking skills.
> > (ii) Job development.
> > (iii) Job analysis.
> > (iv) Career exploration.
> > (v) Placement of individuals with disabilities.

*See* C.R., Item No. 23, Vocational Packet, Section E.

On July 20, 2020, Mr. Sund issued a labor market survey, in which he identified the following seven available jobs as within Claimant's qualifications and work restrictions:

- The first available job identified by Mr. Sund was a registered nurse care manager position offered by General Health Resources, a placement agency. *Id.* at 53. In that position, Mr. Sund explained, the employee would "utilize[] a broad range of skills, clinical expertise, and proficiency" in complex case management and care coordination. *Id.* Much of the work would be performed via telephone. *Id.*

- The second was a transitional care coordinator position, also offered by General Health Resources, which involved "making visits at inpatient facilities, visiting members, performing assessments, reviewing utilization of services," and collaborating with inpatient teams. *Id.* Mr. Sund noted that the position was "sedentary to light duty." *Id.* at 53-54.

- The third was a registered nurse case manager position, offered by Compassus Hospice. *Id.* at 54. In that position, Mr. Sund explained, the employee would visit the homes of hospice patients and "provide both routine and emergency assessments as well as evaluations." *Id.*

- The fourth position was as a community case manager registered nurse, a position offered by Independent Blue Cross. *Id.* In that position, Mr. Sund explained, the employee would conduct frequent "in-home assessments for high-risk, high-dollar, highly impactable members." *Id.*

- The fifth position was as a registered nurse case manager, offered by Mitchell International. *Id.* at 55. Mr. Sund explained that the employee in that position

would work as "a field case manager . . . helping injured workers return to their jobs in a safe and efficient manner." *Id.*

- The sixth was as a "Case Manager [Registered Nurse] Relief Case Management," offered by Thomas Jefferson University Hospital, but with a worksite in Stratford, New Jersey. *Id.* at 56. Mr. Sund characterized the position as "a sedentary-duty job," involving "sitting in an office and utilizing the telephone, writing reports [and] making telephone contacts." *Id.*

- The seventh and final position was as a care navigation coordinator, offered by the Laurel Brook Rehabilitation and Nursing Center in Mount Laurel Township, New Jersey. *Id.* According to Mr. Sund, that position involved "maintaining contact with and documenting patients . . . in an office setting while entering data, maintaining records, and making contact" with individual facilities caring for patients. *Id.* at 56-57.

Following the issuance of the labor market survey, Mr. Sund followed up with each of the employers and confirmed that the positions were still available when Claimant was notified of them. *Id*. at 58. Mr. Sund also estimated the weekly earnings from these positions to be "from $1,354.40 to $1,548.40 a week." *Id.* at 60. To confirm that the positions conformed to Claimant's work restrictions, Mr. Sund personally visited the work sites for all except the first two, since they were offered through a placement agency. *Id.* at 57-58.

On cross-examination, Mr. Sund acknowledged that the letterhead appearing at the beginning of his Initial Report and labor market survey differed from those appearing on the copies sent to Claimant. *Id.* at 101. The discrepancy, according to Mr. Sund, was attributable to changes in formatting made by clerical staff after his initial drafting of the document and before a copy was printed and sent to Claimant.

8

*Id.* at 104. Mr. Sund also acknowledged that, while the initials "CDMS" appear near his signature on his correspondence to Claimant (thus indicating that Mr. Sund was a licensed Certified Disability Management Specialist), his certification as a CDMS expired on December 31, 2019. *Id.* at 64. Asked to explain the inaccuracy, Mr. Sund admitted that he was not sure why the initials were included in the correspondence. *Id.* at 29. Mr. Sund also admitted that his reports sometimes referred incorrectly to the doctors who have treated Claimant. *Id.* at 87-88.

### D. Claimant's Second Testimony

Testifying live before the WCJ, Claimant acknowledged that he had received and reviewed the reports drafted by Mr. Sund. C.R., Item No. 12, 2/23/2022 Hr'g Tr. at 14. Claimant did not believe that he was qualified for any of the positions listed in the labor market survey because he suffers from Crohn's disease. *Id.* at 28. Thus, Claimant explained, he experiences "extreme urgency having to use the bathroom, having to have a bowel movement due to [his] Crohn's disease." *Id.* at 29. In addition, Claimant noted that more than one of the positions required working in New Jersey, where Claimant resides but does not possess an active nursing license. *Id.* at 28. Thus, Claimant declined to apply to any of the listed positions. *Id.* Claimant also acknowledged that he has not applied for any other new jobs due to his concerns about COVID-19. *Id.* at 32.

Claimant took issue with several inaccuracies that he found in Mr. Sund's reports, such as a statement that Claimant graduated with a Bachelor of Science in Nursing from the Pennsylvania State University (Penn State); Claimant explained that he began his studies at Penn State, but ultimately graduated from Villanova University. *Id.* at 14-15. In addition, Claimant denied ever having received the March 10, 2020 financial disclosure letter that Mr. Sund recalled sending out to him,

9

but acknowledged receiving an electronic copy from Mr. Sund via e-mail after their interview. *Id.* at 18. Asked by his counsel to review a copy of the financial disclosure letter, Claimant noted that it listed his employer as "UFP Stockertown, LLC," a name that Claimant did not recognize.[7] *Id.* at 23. Claimant was also asked by his counsel if Mr. Sund ever disclosed that he was not CDMS certified, despite those initials appearing on his letters to Claimant; Claimant responded that Mr. Sund did not. *Id.* at 20.

### E. The WCJ's Decision

In her October 26, 2022 Decision, the WCJ granted Employer's Modification Petition. C.R., Item No. 7. The WCJ explained that she found Mr. Sund's testimony to be "credible, convincing[,] and worthy of belief." *Id.*, Finding of Fact (F.F.) No. 11. Consequently, the WCJ further found that all of the positions identified in Mr. Sund's labor market survey "were within [] Claimant's educational, vocational, and physical capabilities," and "remained open to allow [] Claimant a reasonable opportunity to apply." *Id.*, F.F. Nos. 21-22. The WCJ also credited Dr. Sattel's testimony that Claimant was capable of returning to work in a light-duty capacity. *Id.*, F.F. No. 10. Thus, the WCJ modified Claimant's wage loss benefits from $1,025.00 to $93.70 weekly.[8]

---

[7] Claimant also noted that the correspondence from Mr. Sund sometimes erroneously refers to Claimant's employer as "Penn Presbyterian" and to his treating physician as one Dr. Pedro Beredjiklian, an individual from whom Claimant has never received treatment. 2/23/2022 Hr'g Tr. at 23.

[8] The WCJ explained that $93.70 is 2/3 of the $140.55 that remains after the $1,600.00 average weekly wage (AWW) being offered through the Independence Blue Cross position is subtracted from Claimant's initial AWW of $1,740.55. WCJ Decision, F.F. No. 25 n.12. *See also* Section 306(b)(1) of the Act, 77 P.S. § 512(1) (providing the calculation of compensation for disability partial in character).
**(Footnote continued on next page…)**

10

Addressing the question of Mr. Sund's qualifications, the WCJ noted her finding that Mr. Sund "is a qualified vocational counselor pursuant to [S]ection 306 (b) of the . . . Act and Regulation [34 Pa. Code] §123.202(a)(3) and (5) [sic]."[9] *Id.*, F.F. No. 20. The WCJ explained that Mr. Sund "has a master's degree in social work and has worked for five (5) years or more as a vocational evaluator." *Id.* Additionally, the WCJ found that, notwithstanding Claimant's testimony to the contrary, "Claimant received the vocational disclosure letter dated March 10, 2020," and sent by Mr. Sund. *Id.* at 17.

Regarding Claimant's testimony, the WCJ found it to be not "credible, convincing[,] or worthy of belief." *Id.*, F.F. No. 9. The WCJ cited Claimant's "demeanor and comportment" during his testimony as factors in her conclusion. *Id.* In addition, the WCJ noted that she considered the lack of any medical treatment after August 6, 2019 for the employment injury, as well as Claimant's failure to explain "what portions of the employment position[s] located for him he could not have performed because of his work injury." *Id.*, F.F. No. 9(a), (d). The WCJ additionally found Claimant to be "relying solely upon technical legal issues as a

---

The WCJ further explained that Claimant's earning power was calculated using the Blue Cross position as it was a "sedentary/light[-]duty" position, "with a combination of office and field work, thereby allowing for positional changes throughout the work day." WCJ Decision, F.F. No. 24. An additional consideration was that the position was located in Philadelphia, "the location of the work injury." *Id. See* Section 306(b)(2) of the Act, 77 P.S. § 512(2) (providing that "the usual employment area where the injury occurred" shall be used to determine the earning power of a claimant who does not live in Pennsylvania).

[9] The WCJ's citation of a nonexistent subsection (5) appears to be a typographical error. Mr. Sund's credited testimony was that he was qualified under 34 Pa. Code § 123.202(a)(3) (permitting qualification for individuals who possess a bachelor's degree and are under the direct supervision of an individual possessing qualifications set forth in subsection (1)) and 34 Pa. Code § 123.202(a)(4) (permitting qualification for individuals with 5 or more years of relevant work experience predating August 23, 1996). *See* Sund Dep. at 61-62. We therefore conclude that the "(5)" is intended to be read as "(4)."

basis to challenge the testimony of Mr. Sund," rather than offer any evidence that would actually contradict Mr. Sund's conclusions. *Id.*, F.F. No. 11.

Claimant appealed to the Board, which affirmed the WCJ. *See* C.R., Item No. 10. This appeal followed.[10]

## II. Issues

On appeal, Claimant maintains that Mr. Sund failed to comply with "the Code of Professional Ethics for Rehabilitation Counselors pertaining to the conduct of expert witnesses" as required by Section 306(b)(2) of the Act, 77 P.S. § 512(2). Claimant further argues that the decisions below produce an "absurd" and "unjust" result, given that the Act was not intended to reward Employer's and Mr. Sund's noncompliance with its provisions. Claimant's Br. at 45-46. Additionally, Claimant argues that the decisions below violate his substantive due process rights.

## III. Discussion

Section 4 of the Act of June 24, 1996, P.L. 350, No. 57, commonly referred to as Act 57, enacted the criteria currently used to govern the modification of a partially disabled claimant's benefits. *Riddle v. Workers' Comp. Appeal Bd. (Allegheny City Elec., Inc.)*, 981 A.2d 1288, 1292 (Pa. 2009). Under the method prescribed, now codified at Section 306(b)(2) of the Act, 77 P.S. § 512(2), an employer that files a petition to modify a claimant's benefits from total to partial may succeed if the employer establishes that the disabled claimant has "earning power." *Rebeor v. Workers' Comp. Appeal Bd. (Eckerd)*, 976 A.2d 655, 658 (Pa. Cmwlth. 2009). Section 306(b)(2) further provides that earning power may be

---

[10] This Court's review is limited to determining whether the necessary findings of fact were supported by substantial evidence, constitutional rights were violated, or errors of law were committed. *Borough of Heidelberg v. Workers' Comp. Appeal Bd. (Selva)*, 928 A.2d 1006, 1009 (Pa. 2007). Where the issue presented involves a question of law, our standard of review is *de novo* and our scope of review is plenary. *Id.*

determined through "expert opinion evidence[,] which includes job listings with agencies of the [Department of Labor and Industry], private job placement agencies[,] and advertisements in the usual employment area." 77 P.S. § 512(2). Partial disability will apply where the employee can perform his previous work or, "considering the employe[e]'s residual productive skill, education, age and work experience, engage in any other kind of substantial gainful employment which exists in the usual employment area in which the employe[e] lives within this Commonwealth." *Id.* If the employee is not a Pennsylvania resident, "the usual employment area where the injury occurred shall apply." *Id.* If the employee is found to be partially disabled, Section 306(b)(1) provides that the WCJ shall reduce his wage loss benefits to a figure equal to "sixty-six and two-thirds per centum of the difference between the [pre-injury] wages of the injured employe[e] . . . . and the earning power of the employe[e] thereafter." 77 P.S. § 512(1).

Instantly, the WCJ granted Employer's Modification Petition after crediting expert testimony from Mr. Sund that available jobs were within Claimant's qualifications and capabilities. That testimony, in turn, relied partly on Dr. Sennett's conclusion that Claimant was capable of working with some restrictions on his activities. Pursuant to Section 306(b)(1) of the Act, the WCJ reduced Claimant's benefits to $93.70 weekly, which is 2/3 of the difference remaining when Claimant's earning power of $1,600.00 (i.e., the weekly earnings offered in the open Independence Blue Cross position) is subtracted from his pre-injury AWW of $1,740.55. WCJ Decision, F.F. No. 25.

On appeal to this Court, Claimant no longer disputes the conclusion that he is capable of working in the positions identified by Mr. Sund. Rather, Claimant's appeal rests entirely on his allegation that Mr. Sund failed to comply with Section

13

306(b)(2) of the Act, 77 P.S. § 512(2), and associated regulations. Specifically, Claimant alleges that Mr. Sund violated the provision in Section 306(b)(2) of the Act that vocational experts "shall comply with the Code of Professional Ethics for Rehabilitation Counselors pertaining to the conduct of expert witnesses." 77 P.S. § 512(2). The terms by which a vocational expert remains in compliance with that requirement are set forth in 34 Pa. Code § 123.204(a)-(c):

> (a) Before conducting an earning power assessment interview, the vocational expert shall disclose to the employee, in writing, the role and limits of the vocational expert's relationship with the employee.
>
> (b) A vocational expert who conducts an earning power assessment interview shall generate a written initial report detailing the expert's involvement in the litigation and conclusions from the interview. The initial report need not contain the results or conclusions of any surveys or tests. The vocational expert shall serve a copy of the initial report on the employee and counsel, if known, within 30 days of the date of the interview.
>
> (c) A vocational expert who authors additional written reports, including earning power assessments or labor market surveys, shall simultaneously serve copies of these written reports upon the employee and counsel, if known, when the expert provides the written reports to the insurer or its counsel.

A vocational expert who satisfies the above requirements "complies with the Code of Professional Ethics for Rehabilitation Counselors pertaining to the conduct of expert witnesses for purposes of" Section 306(b)(2) of the Act, 77 P.S. § 512(2). 34 Pa. Code § 123.204(d).

In Claimant's view, Mr. Sund failed to comply with the relevant requirements by incorrectly adding the initials "CDMS" to his name in written correspondence

after his CDMS credential had expired.[11]  Claimant argues that this case is therefore akin to *Riddle*.  In that case, our Supreme Court considered the question of whether Section 306(b)(2) of the Act's instruction that "the usual employment area where the injury occurred shall apply," 77 P.S. § 512(2), when determining a claimant's earning power was strictly mandatory or "merely requires that the area of injury . . . be used as a starting point in developing" that earning power.  981 A.2d at 1291.  The Court held that the statute's *shall apply* language must be interpreted strictly, and that the employer therefore "had no latitude in choosing which markets are relevant" in determining the claimant's earning power.  *Id.* at 1294.  Claimant reasons that Employer has adopted a "broad interpretation" of the word *shall* by hiring "an unqualified interviewer," which this Court should reject, following *Riddle*.  Claimant's Br. at 26.

We agree that Section 306(b)(2) must be strictly construed and, on that ground, reject Claimant's fanciful reading of the statute.  Neither Section 306(b)(2) nor 34 Pa. Code § 123.204 calls for disqualification of a vocational expert who inaccurately includes credentials on written correspondence; in fact, neither

---

[11] Although the issue is omitted from his Petition for Review and the Argument section of his Brief, Claimant maintains in his Statement of the Case that Mr. Sund failed to send him a disclosure letter as "required by Section 306(b)(2.1) and the Bureau regulations [34 Pa. Code] 123.204 and 123.205, before the date of the vocational interview."  Claimant's Br. at 14.

We first note this Court's longstanding requirement that issues be raised in a party's Petition for Review as well as the Argument section of the party's brief; otherwise, the issues may be deemed waived.  *Riley v. Workers' Comp. Appeal Bd. (DPW/Norristown St. Hosp.)*, 997 A.2d 382, 390 n.14 (Pa. Cmwlth. 2010).  Even if Claimant's Brief had been properly organized, however, his allegation that Mr. Sund never sent the letter in question is meritless.  The WCJ noted her finding that "Claimant received the vocational disclosure letter dated March 10, 2020[,] sent by Mr. Jeff Sund of Allegiant Managed Care."  WCJ Decision, F.F. No. 17.  Claimant therefore appears to be asking this Court to ignore the WCJ's credibility determinations and accept his testimony as fact.  We decline to do so, given that the WCJ is "the ultimate finder of fact and the exclusive arbiter of credibility and evidentiary weight."  *Lindemuth v. Workers' Comp. Appeal Bd. (Strishock Coal Co.)*, 134 A.3d 111, 125 (Pa. Cmwlth. 2016).

15

provision makes the merest mention of the issue. Thus, we decline to follow Claimant in imagining requirements that are simply not there. *Riddle* is inapposite because it has never been Employer's position, nor was it a conclusion of the decisions below, that strict Section 306(b)(2) compliance was not mandatory. The point of disagreement between the parties here is not one of statutory interpretation at all, but whether Mr. Sund has complied with the plain language of Section 306(b)(2). Since Claimant fails to call Mr. Sund's compliance into any serious question, we see no reason to disturb the decisions below.

Next, Claimant argues that the WCJ and Board erred by ignoring a "basic principle in workers' compensation that an [e]mployer should not be permitted to benefit from its noncompliance with the Act." *Id.* at 46. In support, Claimant cites *Mosgo v. Workmen's Compensation Appeal Board (Tri-Area Beverage, Incorporated)*, 480 A.2d 1285, 1288 (Pa. Cmwlth. 1984)), in which this Court held that an employer's failure to issue a proper NCP does not shift the burden of proof for the continuation of benefits to the claimant, as doing so would "reward those employers and carriers [that] do not comply with the Act while disadvantaging those who do." Claimant reasons that allowing Employer to prevail in this case would be unjustly rewarding noncompliance, "in direct conflict with well-established legal principles." Claimant's Br. at 46. Since Claimant has failed to substantiate his charge that Employer and Mr. Sund have not complied with Section 306(b)(2), however, this argument is without merit.

Finally, Claimant argues that the decisions below "raise[] . . . constitutional due process concerns." *Id.* at 47. In place of any meaningful development of this argument, Claimant attempts to support that claim with several pages of background information on an employer's general duties and obligations under the Act and the

16

Act's recent amendment history. The single case cited in the section of his Brief purportedly about due process is *Caso v. Workers' Compensation Appeal Board (School District of Philadelphia)*, 839 A.2d 219 (Pa. 2003), in which our Supreme Court held that "if an insurer has engaged in bad faith selection of an unqualified interviewer, claimants may seek the imposition of penalties." *Id.* at 222. Notably, *Caso* did not involve due process rights. We also note that Mr. Sund was properly found to be qualified by the WCJ under 34 Pa. Code § 123.202(a)(3) and (4), which makes the relevance of *Caso* even less clear. In the absence of an adequately developed argument, we decline to engage any further with Claimant's due process claim.

## IV. Conclusion

The WCJ's findings are supported by substantial evidence, and we discern no legal error in her calculation of Claimant's earning power. Accordingly, we affirm the Board.

ELLEN CEISLER, Judge

17

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Stuart Brooks, :
              Petitioner :
 :
    v. : No. 936 C.D. 2023
 :
Trustees of the University of :
Pennsylvania (Workers' :
Compensation Appeal Board), :
              Respondent :

# **O R D E R**

AND NOW, this 21st day of October, 2024, the Order of the Workers' Compensation Appeal Board in the above-captioned matter, dated July 28, 2023, is hereby AFFIRMED.

 

ELLEN CEISLER, Judge